**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **CHAMPION RETAILCO, LLC.** | : | Case No.: 1:20-cv-00645 |
| | : | |
| **Plaintiff** | : | Judge: ____________________ |
| | : | |
| v. | : | |
| | : | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| **DAVID OLSEN *et al.*** | : | |
| | : | |
| **Defendants.** | : | (JURY TRIAL DEMANDED) |
| | : | |

---

Plaintiff Champion RetailCo, LLC ("Champion") respectfully moves the Court, under Fed. R. Civ. P. 65(b), to grant a preliminary injunction against Defendants David Olson and Charles Clemons: (1) for a period of 12 months from the date of the Court's Order precluding Olsen and Clemons from working for Patio Enclosures, a direct competitor of Champion, in violation of the non-compete covenant in their respective employment agreements with Champion; (2) for a period of 24 months from the date of the Court's Order prohibiting Olsen and Clemons from soliciting Champion's customers and employees in violation of the non-solicitation covenant in their respective employment agreements with Champion; and (3) restricting Olsen and Clemons from using or disclosing the trade secrets and/or other confidential and proprietary that the Defendants learned from Champion, or otherwise breaching their employment agreements with Champion.

Further, Champion requests an award of its attorneys' fees, costs, and expenses incurred in preparing this Motion and related documents in support. This relief is necessary to stop the irreparable damage Champion is suffering—the loss of its employees and customers and the

misappropriation of its trade secrets—and the continued damages that Champion will suffer if Olsen and Clemons are not enjoined.

The grounds for this Motion are set forth more fully in the Memorandum in Support of Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

e.s.

Richard L. Moore (0062010)
Simon Y. Svirnovskiy (0097096)
Frost Brown Todd LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Phone: (513) 651-6800
Fax: (513) 651-6981
rlmoore@fbtlaw.com
ssvirnovskiy@fbtlaw.com

***Trial Attorneys for Plaintiff Champion RetailCo, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and served the following via process server:

DAVID OLSEN
3326 Thimbleberry Trail
Dacula, GA 30019

CHARLES CLEMONS
1107 City View Terrace
Chattanooga, TN 37421

e.s.

Richard L. Moore (0062010)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **CHAMPION RETAILCO, LLC.** | : | Case No.: 1:20-cv-00645 |
| **Plaintiff** | : | Judge: ____________________ |
| v. | : | |
| **DAVID OLSEN** | : | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| and | : | |
| **CHARLES CLEMONS** | : | |
| **Defendants.** | : | |

---

## I. INTRODUCTION

As they progressed in their careers at Plaintiff, Champion RetailCo, LLC ("Champion" or "the Company"), Defendants, David Olsen ("Olsen") and Charles Clemons ("Clemons" and, with Olsen, "Defendants") received greater responsibility, higher compensation, and more intimate access to Champion's customer information, other confidential and proprietary data, and employees. Despite the Company's investment in the Defendants, upon resigning from Champion, in short order first Olsen and then Clemons have turned around and violated the employment agreements that they entered—in Olsen's case quite recently—with Champion. Namely, the Defendants have breached, in several ways, non-competition, non-solicitation, and non-disclosure covenants to which they committed when they executed their employment agreements.

Champion is now forced to seek a preliminary injunction requiring Defendants Olsen and Clemons to do nothing more than abide by the Executive Employment Agreements

("Agreements"), to which Olsen agreed in October 2019 (the "Olsen Agreement") and to which Clemons agreed in March 2015 (the "Clemons Agreement").[1]

Olsen and Clemons are believed to have violated their Agreements in multiple ways. They each took competitive positions that were substantially similar to the roles they had at Champion, with Patio Enclosures, a direct competitor, and in the reasonably-restricted geographic zone as set forth in their Agreements. These positions will inevitably lead to the disclosure of Champion's trade secret and confidential information. Unsatisfied, though, upon information and belief, the Defendants further solicited other employees from Champion, directly in violation of the non-solicitation covenants to which they agreed in their Agreements, and have successfully encouraged multiple Champion employees to quit and join Patio Enclosures. Finally, the Defendants have directly, and through their new Champion-based hires, called on Champion's customers, in further violation of their non-solicitation covenants to Champion. A preliminary injunction will protect Champion from the loss of employees, customers, business goodwill, and profits beyond any losses Champion has borne due to the Defendants' coordinated conduct. Without injunctive relief, though, Champion will suffer permanent and irreparable injury.

## II. FACTS

### a. <u>The Nature of Champion's Business</u>

Champion is a Delaware limited liability company that was established in 1953 in Cincinnati, Ohio. (V. Compl., at ¶¶ 10, 16.) The Company designs, builds, and installs windows, doors, and sunrooms, and it also installs roofing and siding. (*Id.*) Champion maintains operations across 29 states and it has locations in 55 metropolitan areas, including Atlanta, Georgia; Chattanooga, Tennessee; Nashville, Tennessee; and Cincinnati, Ohio; among many other markets.

[1] The Clemons Agreement included a First Amendment to the Executive Employment Agreement with Champion.

(*Id.* at ¶ 17.) To serve its customers in these markets, Champion employs various types of industry professionals, ranging from trained manufacturing tradesmen and marketing and retail professionals, to sales representatives, installation technicians, and executives. (*Id.* at ¶ 18.)

**b. <u>Olsen's and Clemons' Work for Champion</u>**

Olsen is a Georgia resident and joined Champion as a Sales Manager in December 2015 in Atlanta, Georgia. (*Id.* at ¶¶ 11, 19.) He was promoted to Division Manager in January 2016 for Champion's Atlanta division, and then to District Sales Manager in January 2018, over both the Atlanta and Macon, Georgia regions. (*Id.*) In consideration for his on-going employment, Olsen agreed to execute the Olsen Agreement with Champion on October 9, 2019. (*Id.* at ¶ 20.)

Clemons is a Tennessee resident and joined Champion as a Division Manager in Chattanooga, Tennessee in January 2015. (*Id.* at ¶¶ 12, 21.) Clemons ran Champion's Chattanooga, Tennessee office until September 2017, after which he was also given responsibility for Knoxville and Nashville, Tennessee. (*Id.* at ¶ 21.) In or around September 2019 Clemons also took over Champion's Birmingham and Huntsville, Alabama offices. (*Id.*) At the start of his employment with Champion, Clemons agreed to and signed the Clemons Agreement, including the First Amendment to the Executive Employment Agreement.[2] (*Id.* at ¶ 22.)

During their respective tenures at Champion, Olsen's and Clemons' work required them to manage relationships with Champion's employees and existing customers, and to develop business with prospective customers. (*Id.* at ¶ 23.) As such, Olsen and Clemons had regular contact with Champion's employees and existing and prospective customers. (*Id.*) Olsen and Clemons also had access to and became intimately familiar with Champion's confidential and proprietary

[2] Clemons executed the First Amendment on the same day, March 2, 2015, that he executed the rest of the Clemons Agreement. The First Amendment adjusted Clemons' compensation scheme (Section 3) and adjusted his non-compete period from 24 months down to 12 months (Section 10). *See* Clemons Agreement at pp. 14-19.

information. (*Id.* at ¶ 24.) This information included, but was not limited to, information pertaining to Champion's employees, customers, prospective customers, costs, profit margins, salaries, pricing, strategies, business plans, techniques, methods, processes, sales, finances, sales plans, and other trade secrets. (*Id.*) Champion preserves the confidentiality of its trade secrets by contractually identifying its proprietary information as confidential, by restricting access to its facilities to Champion personnel, by requiring high-level executives like Olsen and Clemons to enter into restrictive covenants, and by restricting access to the trade-secret information through other reasonable methods, and these efforts are reasonable under the circumstances. (*Id.* at ¶¶ 69-70.) Olsen and Clemons were both highly compensated for their work with Champion, earning in excess of $100,000 per year. (*Id.* at ¶ 25.)

**c. <u>The Terms of the Agreements</u>**

In their respective Agreements, Olsen and Clemons acknowledged that their

> Executive position[s] will require . . . (a) specialized training in the design, use, and operation of the Company's products and services; (b) access to the Company's goodwill, business relationships, and contacts with . . . the Company's customers, potential customers, and employees of those third parties; (c) access to the Company's business, marketing, and/or sales strategies; (d) access to information about the Company's methods of operations, compensation plans, or future business plans; and/or (e) performance of services of a unique and special nature.

(*Id.* at ¶ 26; Agreements, at § 2.) Olsen and Clemons also agreed that, "[t]he Company develops and utilizes technology, models, programs, data, research and development, concepts, goodwill, customer relationships, training, and trade secrets[,]" that "in the performance of [their] job duties, [Olsen and Clemons] will be entrusted with, have access to, and obtain intimate, detailed, and comprehensive knowledge of confidential and/or proprietary information[,]" that such information "is highly valuable and provides a competitive advantage to the Company[,]" and that "given the United States market in which the Company competes, confidentiality of the Information is necessary without regard to any geographic limitation." (*Id.* at ¶ 27; Agreements, at § 8.) As a

result, both Olsen and Clemons agreed to retain Champion's information "in absolute confidence and not to use or permit access to or disclose the Information to any person or organization, except as required for [Olsen and Clemons] to perform [their] job[s] with the Company." (*Id.* at ¶ 28; Agreements, at § 9.) To that end, Olsen and Clemons agreed they would not use or disclose Champion's confidential information for their own or any other entity's benefit, and that they would not accept employment with any "entity where any part of the duties of such employment . . . are such that [Olsen and Clemons] could reasonably be induced or required to reveal, base judgments upon, or otherwise disclose or use" Champion's proprietary information. (*Id.*)

In addition, Olsen and Clemons made a non-competition covenant with Champion. (*Id.* at ¶ 29.) Specifically, the Defendants agreed that due to

> the Company's need to prevent unfair competition and to protect the Company's legitimate business interest . . . **for a period of 12 months** . . . . following [Olsen and Clemons]' termination (for any reason), whether voluntary or involuntary, [Olsen and Clemons] will not accept employment in . . . any business activity . . . with a "Competitor" of the Company where such employment . . . would involve [Olsen and Clemons]: (a) providing, selling or attempting to sell, or assisting in the sale or attempted sale of, or providing or performing management functions, relating to any services or products similar to those services or products with which [Olsen and Clemons] had any involvement or Information during Executive's employment with the Company . . .; or (b) providing or performing services that are similar to any services that [Olsen and Clemons] provided to or performed for the Company during Executive's employment with the Company.

(*Id.*; Olsen Agreement, at § 10; Clemons Agreement (First Amendment) at § 10) (emphasis in original). The Agreements define "Competitor" as "any business or entity that . . . provides or seeks to provide products or services that compete with the products or services of the Company, including, without limitation, any company or business that installs windows, doors, sun rooms, roofing, and/or siding." (*Id.* at ¶ 30; Olsen Agreement at § 10; Clemons Agreement (First Amendment) at § 10.) The restriction is "limited to the geographical area where the Company is

doing business, . . . markets its products and/or services . . ., and . . . where the Company had a documented plan in place . . . to commence conducting business . . .." (*Id.*)

The Defendants also agreed not to unlawfully solicit Champion's current and prospective customers or Champion's employees. Namely, the Defendants recognized that "[t]he Company's business relationships with its customers have been developed through significant effort and often over a period of many years . . .." (*Id.* at ¶ 31; Agreements, at § 11.)

> Therefore, [Olsen and Clemons] agree[d] that the Company's communications, relationships, and business dealings with its customers through its employees are not only protected as part of its [confidential] Information restrictions . . ., but also deserves protection in a manner separate from the non-competition restrictions set forth in Section 10[3] above.

(*Id.*) Thus, in addition to the non-disclosure and non-competition covenants, the Defendants covenanted, for **two years** after leaving Champion, that they would not, in order to try to sell any competitive products or services or try to divert business away from Champion, communicate with "(i) any of the Company's customers from which the Company generated revenue during the 24 months preceding Executive's termination; or (ii) any prospective customers known to [Olsen and Clemons] during the 24 months prior to Executive's termination." (*Id.* at ¶ 32; Agreements, at § 11.) Olsen and Clemons are also prohibited from accepting any such business from a customer or prospective customer. (*Id.*)

Further, Olsen and Clemons promised that they would not, "directly or indirectly, attempt to or actually induce . . . any current or former Company employee, **at any time**, to violate any of such person's . . . agreement(s) with the Company." (*Id.* at ¶ 33; Agreements at § 12) (emphasis in original). And, the Defendants agreed that they would not,

> directly or indirectly, **for a period of 24 months** . . . following [their] termination (for any reason), whether voluntary or involuntary, from the Company: (a) communicate with any current or former Company employee concerning

[3] The Clemons Agreement misidentifies this as "Section 11," which was a typographical error.

> employment opportunities with a competitor; (b) attempt to or actually induce . . any Company employee to terminate such person's employment relationship with the Company, . . .; and/or (c) employ or assist in employing a current or former Company employee in any capacity . . . on behalf of any Competitor.

(*Id.*) (emphasis in original).

The Agreements also explain that because "practical, legal, and/or business considerations may lead the Company not to enforce or to delay enforcement of this Agreement . . . [and that such] election against enforcement or to delay enforcement of this Agreement or any other person's . . . similar agreement . . . shall never be a waiver of either party's right to enforce this Agreement." (*Id.* at ¶ 34; Agreements, at § 15.) And, Olsen and Clemons further agreed that "any breach or threatened breach of this Agreement would result in material damage and immediate and irreparable harm to [Champion] . . . [and that] any breach of the covenant not to compete and/or non-solicitation covenants described [t]herein would result in the inevitable disclosure of [Champion]'s confidential, proprietary, and trade secret Information." (*Id.* at ¶ 35; Agreements, at § 16.) Thus, the Defendants agreed that in addition to any other rights and remedies available to Champion, the Company "shall be entitled to obtain an immediate injunction, whether temporary, preliminary, or permanent, in the event of any such breach or threatened breach by Executive." (*Id.*) And, the Defendants agreed that the restricted periods do not expire until 12 months or 24 months, as applicable, after the date on which the Defendants stop violating the restrictive covenants. (*Id.*)

Notably, the Defendants agreed that they gave "careful consideration of the scope and extent of the restrictions and limitations" in the restrictive covenants. (*Id.* at ¶ 36; Agreements, at § 16.) After such careful consideration, the Defendants each agreed that the prohibitions and obligations were (a) reasonable in scope, territory, and duration; (b) are designed to eliminate only unfair competition; (c) do not stifle the Defendants' inherent skill and experience; (d) do not

prevent the Defendants from using their general abilities to obtain gainful employment; (e) are required to protect Champion's legitimate business interests; and (f) do not give Champion a benefit disproportionate to the Defendants' detriment. (*Id.*)

The Defendants also agreed that Champion "shall be entitled to reasonable attorneys' fees and court cost incurred in any such action which results in: (a) the enforcement of any provision or section of this Agreement against the Executive and to [Champion]'s benefit; or (b) an award of any damages to [Champion]." (*Id.* at ¶ 37; Agreements, at § 16.) Olsen and Clemons promised to share their respective Agreements with their prospective and/or actual subsequent employers and also promised not to indicate on any business materials that they are or were formerly employed by Champion. (*Id.* at ¶ 38; Agreements, at §§ 17-18.) Finally, the Agreements provide that Delaware law applies; that venue lies and personal jurisdiction is proper in the state or federal courts in Hamilton County, Ohio; and that the Agreements are fully integrated. (*Id.* at ¶ 39; Agreements, at §§ 19, 22, and 26.)

**d. <u>One at a Time, Olsen and Clemons Leave Champion to Work at Patio Enclosures</u>**

On October 25, 2019, Olsen terminated his employment with Champion in the Atlanta, Georgia area to go to work as a Regional Sales Manager for Patio Enclosures, also in the Atlanta area. (*Id.* at ¶ 40.) Patio Enclosures provides sunrooms, windows, and doors, among other products and services and, as such, Patio Enclosures is one of Champion's direct competitors. (*Id.* at ¶ 41.) Pursuant to the Olsen Agreement, Olsen was not allowed to work for Patio Enclosures in the Atlanta area and in the Regional Sales Manager role. (*Id.* at ¶ 42.) Under the Olsen Agreement, Olsen was further barred from soliciting Champion customers and employees for a period of 24 months after the end of his employment with Champion. (*Id.* at ¶ 43.) Yet, after Olsen's departure, Champion learned that, upon information and belief, he was soliciting and encouraging multiple

Champion employees to quit their jobs and to work at Patio Enclosures. (*Id.* at ¶ 44.) One of these solicited employees was Clemons. (*Id.*)

On March 14, 2020, Clemons terminated his employment with Champion in the Chattanooga, Tennessee area to go to work as a District/Regional Manager for Patio Enclosures in Chattanooga. (*Id.* at ¶ 45.) Under the Clemons Agreement, Clemons was not permitted to work for Patio Enclosures in Chattanooga as a District/Regional Manager. (*Id.*) Based on the Clemons Agreement, Clemons was further restricted from soliciting Champion customers and employees for a period of 24 months after the end of his employment with Champion. (*Id.* at ¶ 46.) But, after Clemons' departure, Champion learned that, upon information and belief, he joined Olsen in soliciting and encouraging multiple Champion employees to quit their jobs and accept employment at Patio Enclosures. (*Id.*)

In January 2020, Champion became aware that, upon information and belief, Olsen had successfully solicited several other Champion employees who had previously worked for Olsen at Champion in the Atlanta area to leave Champion to go to work for Patio Enclosures, also in Atlanta. (*Id.* at ¶ 47.) In May and April 2020, Champion further learned that, upon information and belief, Olsen and Clemons had successfully solicited even more Champion employees who had previously worked for Olsen and Clemons at Champion to leave Champion to go to work for Patio Enclosures. (*Id.*) As a direct result of Olsen's and/or Clemons' solicitation of these employees in violation of the Agreement, Champion has suffered both actual damages and irreparable harm due to the departure of these employees. (*Id.* at ¶ 48.) At all times, Champion fully performed its obligations under the Agreements. (*Id.* at ¶ 57.)

## III. LAW AND ARGUMENT

The Sixth Circuit has laid out four factors for courts to consider when deciding whether to grant or deny a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998). A plaintiff need not satisfy all these factors to obtain a preliminary injunction, and a court is not required to make a specific finding for each of the factors if fewer than four are decisive. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003). Champion carries its burden for immediate injunctive relief because each of the four factors weighs in favor of granting a preliminary injunction in Champion's favor. Thus, Champion requests the Court to grant Champion's motion in full.

**a. Delaware law Applies to the Dispute.**

The Olsen and Clemons Agreements each provide that Delaware law applies to disputes arising out of the Agreements. (V. Compl. at ¶ 39; Agreements, at § 22.) Contractually-agreed-upon choice of law clauses are enforceable under Delaware and Ohio law. *See* 6 Del. Code § 2708(a) and *Contech Constr. Prods., Inc. v. Blumenstein*, No. 1:11cv878, 2012 WL 2871425, at *8 (S.D. Ohio July 12, 2012) (courts in Ohio will honor contractual choice of law clauses unless the chosen state has no substantial relationship to the parties or the transaction, or the chosen state law's application would be contrary to a fundamental policy of a state with a materially greater interest than the chosen state in determining the particular issue) (*citing* Restatement (Second) of Conflict of Laws § 187(2)). Choice of law clauses in a contract "shall conclusively be presumed to be a significant, material and reasonable relationship with [Delaware] and shall be enforced

whether or not there are other relationships with [Delaware]." 6 Del. Code § 2708(a). Champion is a Delaware limited liability company, the defendants are Georgia and Tennessee residents who executed the Agreements, which possessed clear language selecting Delaware law, and the application of Delaware law will not be contrary to a fundamental policy of Ohio or another state with a potential interest in determining the issues. (V. Compl. at ¶¶ 10-12, 39.) Thus, Delaware law applies to this dispute.

**b. Champion is Likely to Succeed on the Merits of its Claims Against the Defendants.**

In general, courts apply a "sliding" scale in that the more likely it is that the plaintiff will prevail on the merits, the less need there is to show irreparable harm. Conversely, if the plaintiff makes a strong showing of irreparable harm, preliminary injunctive relief may be granted as long as the plaintiff has raised questions that are "fair ground for litigation." *Cabot Corp. v. King*, 790 F. Supp. 153, 155 (N.D. Ohio 1992), citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537 (6th Cir. 1978). Here, Champion has made a strong showing that it will prevail on the merits of its claims and that this Court should award Champion a preliminary and permanent injunction.

**i. *Champion is Likely to Prevail on its Breach of Contract Claims.***

Besides the claims for injunctive and declaratory relief, Champion's Verified Complaint contains three causes of action against Olsen and Clemons: one for breach of contract, a second for tortious interference with business relations, and a third for misappropriation of trade secrets. Champion should prevail on each of these claims, which underpin its request for injunctive relief.

*1. The Non-Compete Covenant is Reasonable and Enforceable.*

To be enforceable under Delaware law, a non-compete covenant must: (1) meet general contract law requirements; (2) be reasonable in scope and duration; (3) advance a legitimate economic interest of the party enforcing the covenant; and (4) survive a balance of the equities.

*All Pro Maids, Inc. v. Layton*, No. Civ.A 058-N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004) (internal citations omitted). The Agreements' non-compete covenant meets each requirement.

**First**, the Agreements and their covenants not to compete are valid and enforceable contract as a matter of contract law. *See McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987) (evaluation of a non-compete covenant under contract law first tests "whether the promise was in fact made, whether it was supported by consideration . . . [and] whether a material breach of the party excuses performance") (internal citation omitted). Olsen and Clemons made promises in the Agreements not to work for Champion's competitors for one year after leaving Champion (V. Compl. at ¶ 29; Olsen Agreement, at § 10; Clemons Agreement (First Amendment) at § 10). Those promises were supported by consideration since Olsen's promise was made in exchange for his on-going, at will employment. (*Id.* at ¶ 20); *see also All Pro Maids*, 2004 WL 187874 at *5 (continued employment is sufficient consideration for a non-compete covenant where the employee in question was at-will); *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466-67 (Del. Ch. 1977) (beneficial change in employee's status constitutes sufficient consideration to support a non-compete covenant agreed after the initial taking of employment). Clemons' promise was made in exchange for his initial employment in an executive role with Champion. (V. Compl. at ¶ 22); *see also All Pro Maids*, 2004 WL 187874 at *3 (signing contract at outset of employment constitutes sufficient consideration to support non-compete covenant under Delaware law). Finally, Champion performed its obligations under the Agreements. (V. Compl. at ¶ 57.)

**Second**, the non-compete covenant in the Agreements advances one of Champion's legitimate economic interests. Under Delaware law, an employer's protectable interest includes its legitimate economic interests and its legitimate interest in protecting business secrets shared with an employee in the course of the employment relationship. *See Knowles-Zeswith Music v.*

*Cara*, 260 A.2d 171, 175 (Del. Ch. 1969). This is *especially* true for sales representatives. Indeed, Delaware "[c]ourts have long recognized that an employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." *Research & Trading Corp. v. Pfuhl*, No. 12527, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992). Indeed, "[m]ore than anything else, [the former employer] has a legitimate interest in preventing [the former employee]'s contacts, developed as an employee and officer [of the former employer] . . ., from being used in competition against it." *Tri-State Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004).

The non-compete covenant at issue is narrowly tailored. It only seeks to prevent unfair competition and restricts the Defendants, for 12 months, from working for one of Champion's competitors, and only where such work would involve the actual or attempted sales, or responsibility over such actual or attempted sales, of services or products that are similar to those service or products with which the Defendants worked at Champion. (*Id.* at ¶ 29; Agreements, at § 10.) Competitors, too, are carefully defined as entities that provide or seek to provide services that compete with Champion's products or services, including windows, doors, sun rooms, roofing, and/or siding. (*Id.* at ¶ 30; Olsen Agreement, at § 10; Clemons Agreement (First Amendment) at § 10.) Olsen and Clemons were high-level, highly-compensated sales executives at Champion, who were equipped with Patio's valuable sales and customer data and were well-positioned with Champion's customers and sales employees. (*Id.* at ¶¶ 19, 21, 23-25.) Patio Enclosures provides sunrooms, windows, and doors, and, as such, it is one of Champion's direct competitors. (*Id.* at ¶ 41.) Further, Champion understands that the Defendants have taken sales management roles at Patio Enclosures that are substantially similar to the roles each Defendant held with Champion.

(*Id.* at ¶¶ 45-46.) The Defendants' actions are precisely the ones that Delaware law seeks to protect employers from. The non-compete covenant advances and protects one of Champion's legitimate economic interests.

**Third**, the Agreements' non-compete covenant is geographically and temporally reasonable. The non-compete at issue lasts one year and applies only to the geographic locations in which Champion operates. (*Id.* at ¶¶ 29-30; Olsen Agreement, at § 10; Clemons Agreement (First Amendment) at § 10.) Year-long non-competes are regularly enforced under Delaware law. *See Merrill Lynch Pierce Fenner & Smith v. Price*, No. 11097, 1989 WL 108412, at *1 (Del. Ch. Sept. 13, 1989) (upholding 1-year limitation on soliciting customers); *Faw, Casson & Co.*, 375 A.2d at 469 (enjoining employee defendants from competing for more than one year). Further, non-competition agreements should be enforced "over a geographic area that is reasonable under the circumstances." *Pfuhl*, 1992 WL 345465 at *11. Indeed, "Delaware courts and other jurisdictions have permitted a nationwide non-compete covenant in certain circumstances and are not averse to broad geographical scopes when they are necessary to protect the legitimate business interest of the party trying to enforce the covenant." *O'Leary v. Telecom Res. Serv., LLC*, No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011); *see also Atl. Diving Supply, Inc. v. Moses*, No. 2:14cv380, 2014 WL 3783343, at *13 (E.D. Va. July 31, 2014) (citing *O'Leary* for the proposition that "Delaware law generally supports the reasonableness of one-year nationwide restrictive covenants" and applying Delaware law to enforce a one-year nationwide covenant against customer solicitation and acceptance of business by a regional account manager for Hawaii and Korea while employed by a firm specializing in equipment, procurement, and support solutions for the defense industry); *Research & Trading Corp. v. Powell*, 468 A.2d 1301, 1305 (Del. Ch. 1983) (enforcing two-year nationwide covenant not to sell lines of products

competing with the former employer's lines); *McCann Surveyors*, 611 A.2d at 4 (finding 3-year, 50-mile-radius-of-any-office covenant against former general clerical assistant was presumptively reasonable). Notably, the non-compete at issue here is narrower than many that have been enforced under Delaware law. Champion is not seeking to enforce a nationwide non-compete; it only requests to keep the Defendants from working for competitors, in competitive roles, in markets in which Champion does business. Thus, under Delaware law, the non-compete covenant has a reasonable temporal and geographic scope.

**Fourth**, the equities favor enforcing the non-compete in Champion's favor. In signing their Agreements, the Defendants, two sophisticated and highly compensated sales executives, recognized that the narrow, non-competition covenant was needed "to prevent unfair competition and to protect [Champion]'s legitimate business interest." (V. Compl. at ¶ 29, Olsen Agreement, at § 10; Clemons Agreement (First Amendment) at § 10.) The Defendants also agreed that they carefully considered the scope and extent of the restrictions and limitations in the restrictive covenants. (*Id.* at ¶ 36; Agreements, at § 15.) Then, after this careful consideration, the Defendants further agreed that the prohibitions and obligations were (a) reasonable in scope, territory, and duration; (b) are designed to eliminate only unfair competition; (c) do not stifle the Defendants' inherent skill and experience; (d) do not prevent the Defendants' from using their general abilities to obtain gainful employment; (e) are require to protect Champion's legitimate business interests; and (f) do not give Champion a benefit disproportionate to the Defendants' detriment. (*Id.*) Champion did not hide the ball here—it was transparent in the opportunities it provided to the Defendants and the expectations and restrictions it placed upon those same Defendants. As such, the non-compete covenant in the Agreements survives a review of the equities.

2. *The Non-Solicitation Covenants are also Reasonable and Enforceable.*

For similar reasons as noted above, the Agreements' non-solicitation covenants are reasonable and enforceable. In the Agreements, the Defendants covenanted for two years after leaving Champion, that they would will not communicate with "(i) any of the Company's customers from which the Company generated revenue during the 24 months preceding Executive's termination; or (ii) any prospective customers known to [Olsen and Clemons] during the 24 months prior to Executive's termination" if the purpose of that communication was to divert business from Champion or to sell competing products or services. (*Id.* at ¶ 32; Agreements, at § 11.) Olsen and Clemons are also prohibited from accepting any such business from a customer or prospective customer. (*Id.*) Notably, the Defendants recognized that Champion's "business relationships with its customers have been developed through significant effort and often over a period of many years . . .." (*Id.* at ¶ 31; Agreements, at § 11.) The Defendants also promised that for two years after leaving Champion, they would not solicit current or former Champion employees to work for a competitor and they would not try to or actually induce any current Champion employees to leave Champion. (*Id.* at ¶ 33; Agreements, at § 12.)

The Delaware Chancery Court particularly noted that "[r]easonable protection for an owner of a decentralized business is necessary because the former employee has had an opportunity to develop economically valuable relationships with his former employer's customers . . .." *Knowles-Zeswith Music*, 260 A.2d at 175. Notably, this is precisely the situation at bar, where Champion relies on its sales executives to oversee their individual regions as Champion operates across 29 states and has locations in 55 metropolitan areas nationwide. (V. Compl. at ¶ 17.) As such, Delaware Courts routinely enforce non-solicitation covenants. *See Pfuhl*, 1992 WL 345465 at *12 ("In recognition of the employer's right to preserve its customer relationships from misappropriation, this court has *repeatedly enjoined* former employees from dealing with the

customers of their former employer with whom the employee had contact.") (collecting cases); *Tri-State Courier & Carriage, Inc.*, 2004 WL 835886 at *10 (goodwill of clients and a company's confidential information have "long been recognized as legitimate economic interests of a former employer"). The Agreements' non-solicitation covenants are enforceable under Delaware law.

*3. Olsen and Clemons Have Breached Their Non-Solicitation and Non-Competition Covenants to Champion.*

Olsen left his job as a Division Manager for Champion in December 2019 and quickly went to work as a Regional Sales Manager for direct competitor, Patio Enclosures, in the very same market in which he worked for Champion. (V. Compl. at ¶¶ 40-41.) Upon information and belief, Olsen also solicited Champion's other employees, including Clemons, to quit Champion and go to work at Patio Enclosures. (*Id.* at ¶¶ 44, 47-48.) These actions violated the non-competition and non-solicitation covenants in the Olsen Agreement. (*Id.* at ¶¶ 42-43.) Likewise, Clemons left his job as a District Manager for Champion in March 2020 and went to work as a District/Regional Manager for Patio Enclosures in the same market in which he worked for Champion. (*Id.* at ¶ 45.) Upon information and belief, Clemons has joined Olsen in further soliciting and recruiting other Champion employees to quit Champion and work for Patio Enclosures. (*Id.* at ¶¶ 46-48.) These actions violated the non-competition and non-solicitation covenants in the Clemons Agreement. (*Id.* at ¶¶ 45-46.) As a result, since those restrictive covenants are reasonable and enforceable under Delaware law, Champion is likely to prevail on the merits of its breach of contract claims against each Defendant.

**ii. *Champion is Likely to Prevail on its Tortious Interference Claims.***

Champion will also likely prevail on its tortious interference with business relations claim. Under Delaware law, Champion will need to establish that it had (a) a reasonable probability of a business opportunity; (b) that the Defendants intentionally interfered with that business

opportunity; and (c) that such interference proximately caused actual damages. *Malpiede v. Townson*, 780 A.2d 1075, 1100 (Del. 2001) (internal citations omitted). Here, the Defendants certainly knew that Champion had a reasonable probability (and even more) of a business opportunity with its employees since those employees were working for Champion and were previously being supervised by the Defendants in that capacity. (V. Compl. at ¶ 47.) The Defendants' interference, upon information and belief, was intentional since they knew about the obligations to not interfere set forth in their respective Agreements but they interfered anyway. And, this interference proximately caused actual damages to Champion in the loss of its employees. (*Id.* at ¶ 48.)

**iii. *Champion is also Likely Prevail on its Trade Secret Misappropriation Claims.***

Trade secrets are protected by statute in Delaware and may, in addition, also be protected under a covenant not to compete. A trade secret is defined in Delaware as:

> Information . . . that: (a) [d]erives independent economic value, actual or potential, from not being known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy

6 Del. Code § 2001(4). Customer identities can constitute a trade secret in Delaware. *Meyer Ventures, Inc. v. Barnak*, No. 11502, 1990 WL 172648, at *8 (Del. Ch. Nov. 2, 1990). The Delaware Uniform Trade Secrets Act ("DUTSA") provides that "[a]ctual or threatened misappropriation may be enjoined." 6 Del. C. § 2002(a).

In addition, Delaware recognizes the inevitable disclosure doctrine. *See W.L. Gore & Assocs., Inc. v. Wu*, No. Civ.A. 263-N, 2006 WL 2692584, at * 14 (Del. Ch. Sept. 15, 2006) (granting five and ten-year injunctions sought by the plaintiff and finding "there exists a substantial likelihood of 'inevitable disclosure' of [Plaintiff's] trade secrets if [Defendant] is allowed to work

with [the new employer]" and reasoning that "[Defendant] cannot 'unlearn' what he learned while working at [Plaintiff]. If [Defendant] is allowed to work with [the new employer], his extensive knowledge would almost certainly filter into his work and result in disclosure of [Plaintiff's] trade secrets"); *UtiliSave, LLC v. Miele*, No. 10729-VCP, 2015 WL 5458960, at * 9 (Del. Ch. Sept. 17, 2015) (ruling that the plaintiff advanced "a colorable inevitable disclosure argument, which alleges that [Defendant] knew the [Plaintiff]'s confidential . . . [p]rocess and, in attempting to compete with [Plaintiff], would inevitable use or disclose their trade secrets").

While employed with Champion, Olsen and Clemons were given access to and became intimately familiar with Champion's confidential and proprietary information. (V. Compl. at ¶ 24.) This included information about Champion's employees, customers, prospective customers, costs, profit margins, salaries, pricing, strategies, business plans, techniques, methods, processes, sales, finances, sales plans, and other trade secrets. (*Id.*) Further, Champion safeguards the confidentiality of trade secrets by contractually identifying its proprietary information as confidential, restricting access to its facilities to Champion personnel, requiring high-level executives like Olsen and Clemons to enter into restrictive covenants, and restricting access to the trade-secret information through other reasonable methods, and these measures are reasonable under the circumstances to maintain the information's secrecy. (*Id.* at ¶¶ 69-70.)

By taking positions with Champion's direct competitor, Patio Enclosures, that are nearly identical to the positions Olsen and Clemons previously held with Champion, Olsen and Clemons have threatened and inevitably will in the future, unless enjoined by this Court, use and misappropriate Champion's confidential information and trade secrets in violation of the Delaware Trade Secrets Act. Indeed, due to Olsen's and Clemons' broad knowledge of Champion's trade secrets and other confidential information, and because their roles with Patio Enclosures are the

same or similar to the roles each Defendant had with Champion, it is inevitable and unavoidable that Olsen and Clemons will consciously or unconsciously use or disclose Champion's trade secrets in the future. Olsen and Clemons agreed as much in their Agreements. They acknowledged that Champion develops and uses trade secrets; that they would be entrusted with, have access to, and obtain intimate, detailed, and comprehensive knowledge of Champion's proprietary and/or confidential information; that this information is highly valuable and gives Champion an edge over its competitors; and that confidentiality is necessary without regard to any geographic limitation because of the United States market in which Champion competes. (*Id.* at ¶ 27; Agreements, at § 8.) Because they understood the sensitive nature of the information they received, Olsen and Clemons agreed to retain Champion's information "in absolute confidence" and not to use or disclose the same for any reason (aside from their work at Champion). (*Id.* at ¶ 28; Agreements, at § 9.) And finally, the Defendants agreed that any breach of their non-competition and non-solicitation agreements "would result in the inevitable disclosure of [Champion]'s confidential, proprietary, and trade secret Information." (*Id.* at ¶ 35; Agreements, at § 16.)

As the Defendants themselves recognized, joining and working for Patio Enclosures would inevitably lead to them misappropriating and improperly using Champion's confidential and trade secret information, which Champion treated as confidential and trade secret. Thus, Champion is likely to prevail on its misappropriation of trade secrets claims against the Defendants.

**c. <u>Champion Will Suffer Permanent and Irreparable Harm Without an Injunction.</u>**

If Olsen and Clemons are not enjoined, Champion will continue to suffer permanent and irreparable harm. Under Delaware law, an employer establish irreparable harm by demonstrating a threat of injury (such as immediate loss of business) that will occur before a trial may be had,

which injury could not be adequately compensated with money damages or by equitable relief at a later time. *McCann Surveyors*, 611 A.2d at 1-2.

Notably, under Delaware law, contractual stipulations as to irreparability suffice to establish this element for the purpose of issuing injunctive relief. *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1226 (Del. 2012) ("Delaware 'courts have long held that contractual stipulations as to irreparable harm suffice to establish that element for the purpose of issuing . . . injunctive relief.'") (quoting *Cirrus Holding Co. Ltd. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1209 (Del. Ch. 2001)); *see also Newell Rubbermaid, Inc. v. Storm*, No. 9398-VCN, 2014 WL 1266827, at *11 (Del. Ch. Mar. 27, 2014) (same). In their Agreements, Olsen and Clemons agreed that "any breach or threatened breach of this Agreement would result in material damage and immediate and irreparable harm to [Champion] . . .." (V. Compl. at ¶ 35; Agreements, at § 16.) As such, the Defendants agreed that in addition to all other rights and remedies available to Champion, the Company "shall be entitled to obtain an immediate injunction, whether temporary, preliminary, or permanent, in the event of any such breach or threatened breach by Executive." (*Id.*) And, the Defendants agreed that the restricted periods on the covenants in the Agreements would not expire until 12 months or 24 months, as applicable, after the date on which the Defendants stop violating those covenants. (*Id.*) Following *Newell Rubbermaid*, *Cirrus Holding Co.*, and *Atl. Diving Supply*, because the Defendants contractually agreed to the irreparable nature of their actual or threatened breaches of the Agreements' restrictive covenants, this element has been established under the law.

Further, Champion has already seen the effects of the Defendants' competition as the Defendants have lost several key sales employees in the very markets in which the Defendants

previously operated for Champion. Losing these employees and their sales relationships and contacts—particularly to a direct competitor—constitutes immediate and irreparable harm.

### d. <u>The Balance of Equities Tips in Champion's Favor and Issuing an Injunction Serves the Public Interest</u>

Issuing an injunction in Champion's favor is the equitable result and will serve the public interest. Delaware courts grant preliminary injunctions to enforce restrictive covenants where such injunctions protect against the destruction or misuse of customers relationships but do not prevent the defendants from earning a livelihood by pursuing their professions. *Pfuhl*, 1992 WL 345465 at *13. Further, the DUTSA authorizes enjoining threatened misappropriation. 6 Del. C. § 2002(a). In their Agreements, Olsen and Clemons agreed that the restrictive covenants therein do not stifle the Defendants' inherent skill and experience, do not prevent the Defendants from using their general abilities to obtain gainful employment, and do not give Champion a benefit disproportionate to the Defendants' detriment. (V. Compl. at ¶ 36; Agreements, at § 16.) The Defendants are sales professionals who are free to use their sales skills to work in any other industries other than designing, building, and installing windows, doors, sunrooms, roofing, and siding. An injunction will not unduly harm the Defendants and it will also protect the investment Champion has made in its business. On the other hand, denying injunctive relief will reward Olsen and Clemons for flouting their contractual obligations and deliberately causing harm to Champion, and denial could encourage other executives at Champion to wreak similar havoc on the Company.

## IV. CONCLUSION

For the reasons set forth in this motion and memorandum and the Verified Complaint, Champion respectfully requests that the Court, following a hearing and determination of the issues, enter a preliminary and/or permanent injunction against Olsen and Clemons under Count Five of the Verified Complaint.

Respectfully submitted,

e.s.

Richard L. Moore (0062010)
Simon Y. Svirnovskiy (0097096)
Frost Brown Todd LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Phone: (513) 651-6800
Fax: (513) 651-6981
rlmoore@fbtlaw.com
ssvirnovskiy@fbtlaw.com

***Trial Attorneys for Plaintiff Champion RetailCo, LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and served the following via process server:

DAVID OLSEN
3326 Thimbleberry Trail
Dacula, GA 30019

CHARLES CLEMONS
1107 City View Terrace
Chattanooga, TN 37421

e.s.
Richard L. Moore (0062010)